## SANITARY DISTRICT OF CHICAGO v. UNITED STATES.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 161. Argued December 8, 9, 1924.—Decided January 5, 1925.

1. A suit to enjoin an agency of the State of Illinois from continuing diversions of water from Lake Michigan which lower that lake and threaten the like effect upon other lakes and connecting waters of the Great Lake System, including the St. Lawrence, is maintainable by the United States not only to remove obstruction to interstate and foreign commerce, but also to carry out treaty obligations to a foreign power. (Treaty of January 11, 1909, with Great Britain, 36 Stat. 2448.)  P. 425.
2. *Semble* that such a suit might also stand upon an ultimate sovereign interest in the Lakes. *Id.*
3. The suit may be brought by the Attorney General, in virtue of his office, and it need not be authorized by a statute.  P. 426.
4. The power of the United States to remove obstructions to interstate and foreign commerce is superior to that of the States to provide for the welfare or necessities of their inhabitants. *Id.*
5. Touching interstate and foreign commerce, in so far as the States may act Congress can override what they have done; but, in matters of imminent and direct national importance, they may not act at all, even where Congress has been silent. *Id.*

6. Irrespective of any international compact, a State cannot authorize diversions of water from the Great Lakes which will affect their level, without the consent of Congress.  P. 426.

7. Even if it were possible for the United States to estop itself by grant or contract from exercising its power in matters of national and international concern, its act must be strictly construed against such a result.  P. 427.

8. The Act of March 2, 1827, granting land to Illinois to open a canal uniting the waters of the Illinois River with those of Lake Michigan vested no irrevocable discretion in the State with regard to the amount of water to be withdrawn from the Lake. *Id.*

9. The withdrawal of water in this case, except in so far as it may be authorized by the Secretary of War, is prohibited by the Act of March 3, 1899, c. 425, § 10, 30 Stat 1151, as involving a change in the condition of the Lakes and the Chicago River (admitted to be navigable) and an obstruction to their navigable capacity. P. 428.

10. Revocable licenses granted by the Secretary of War under the above Act of 1899, concerning the appellant's canal and the quantity of water to be taken from Lake Michigan,—considered and *held* no justification for the excessive diversions here complained of by the Government.  P. 429.

11. Refusal of the Secretary of War to license greater withdrawals of water from Lake Michigan by the appellant through its canal, for the sanitation of Chicago, did not infringe any rights of that City arising from its investment in the canal property, or of States bordering on the Mississippi based on their interest in increasing the artificial flow; nor were those states or the city, entitled to be heard before the license was refused.  P. 431.

Affirmed.

APPEAL from a decree of the District Court enjoining the appellant from diverting water from Lake Michigan in excess of 250,000 cubic feet per minute, the amount authorized by the Secretary of War.

*Mr. Edmund D. Adcock*, with whom *Mr. Clyde L. Day, Mr. George F. Barrett* and *Mr. Louis J. Behan* were on the briefs, for appellant.

I. Appellant was organized under an act of Illinois passed in the exercise of the State's police power.  This

act fixed appellant's powers and duties, and specified the required diversion of water from Lake Michigan. *Wilson v. Board of Trustees*, 133 Ill. 443, 465; *People v. Nelson*, 133 Ill. 565, 580, 582, 592, 594; *Beidler v. Sanitary District*, 211 Ill. 628, 638; *Pittsburg, etc. Ry. Co. v. Sanitary District*, 218 Ill. 286, 287, 295; *United States v. Bellingham Bay Co.*, 176 U. S. 211.

The diversion of water to operate the Canal has been authorized by the Act of Congress of March 2, 1827. *Missouri v. Illinois*, 200 U. S. 496, 519, 526; *Mortell v. Clark*, 272 Ill. 201, 213; Messages and Papers of the Presidents, vol. 5, p. 3334.

Appellee, through its engineer officers and the Secretary of War, observed the action of the State of Illinois and appellant pursuant to its authority in planning and constructing the diversion works. The Secretary consented to the work necessary to accomplish the diversion and authorized the opening of the main channel of the district. He construed the Act of March 2, 1827, *supra,* and the laws of Illinois, as affirmatively authorizing the diversion.

The Secretary, charged with the duty of enforcing the Rivers and Harbors Acts of 1890 and 1899, has thus construed a diversion to the capacity of appellant's canal, to have been "affirmatively authorized by law" and "affirmatively authorized by Congress." These acts of the Secretary should have the force of judicial interpretation.

II. The permits of the Secretary of July 11, 1900, authorizing the work of deepening and widening the channels of the Chicago River to provide for the diversion or abstraction from Lake Michigan through them of the amount of water required by the state law according to the population of appellant, constituted all the authority required by appellant from appellee, to divert said waters. *Maine Water Co. v. Knickerbocker Co.*, 99 Me. 473;

Rivers and Harbors Act of 1890, §§ 7 and 10; Rivers and Harbors Act of 1899, §§ 9, 10 and 12.

The altering or modifying· of the navigable capacity of the waters affected was thus authorized and is lawful. *Cummings* v. *Chicago,* 188 U. S. 410; *Hubbard* v. *Fort,* 188 Fed. 987; *Maine Water Co.* v. *Knickerbocker Co., supra; Hudson County Water Co.* v. *McCarter,* 209 U. S. 349.

III. The Secretary of War has authorized the opening of the canal, its operation and attendant diversion of water, by the permit of May 8, 1899, every condition of which has been fulfilled, assuming such conditions to be valid. See *Monongahela Bridge Co.* v. *United States,* 216 U. S. 177, 195; *Philadelphia Co.* v. *Stimson,* 223 U. S. 605; *Kwock Jan Fat* v. *White,* 253 U. S. 454, 464.

The Attorney General, under the Act of March 3, 1899, is only authorized to institute suits for the removal of structures. The District Court was without jurisdiction to entertain this suit. Act of March 3, 1899, § 12; *Ogden City* v. *Boreman,* 20 Utah, 98; Endlich, Interp. of Stats., § 51; Sutherland Stat. Constr., § 140; *United States* v. *Rio Grande Co.,* 174 U. S. 690.

The Secretary of War is only authorized to grant or refuse a permit. He has no power to regulate the diversion.

IV. The Illinois Act of May 29, 1889, was sufficient legislative authority for appellant's diversion works and for the diversion of water required by them. *Cummings* v. *Chicago,* 188 U. S. 410, 427, 428, 430; *Montgomery* v. *Portland,* 190 U. S. 89, 107; *Corrigan Transit Co.* v. *Sanitary District,* 137 Fed. 851, 856; *Canada Atlantic Transit Co.* v. *Chicago,* 210 Fed. 7, 10, 11; *Laurel Hill Cemetery* v. *San Francisco,* 216 U. S. 358; *Escanaba Co.* v. *Chicago,* 107 U. S. 678; *Lake Shore, etc. Ry. Co.* v. *Ohio,* 165 U. S. 365; *Cardwell* v. *American Bridge Co.,* 113 U. S. 205; *Huse* v. *Glover,* 119 U. S. 543; *Willamette Bridge Co.* v. *Hatch,* 125 U. S. 1.

The creation of appellant's canal and its other diversion works, was " authorized by law " under the Rivers and Harbors Act of 1890. *United States* v. *Bellingham Bay Co.,* 176 U. S. 211.

The diversion is lawful under the police power without the express consent of the Secretary of War. Any other construction of the Act of March 3, 1899, would tend to nullify appellant's acts in the interest of public health, which cannot be where the congressional intention is not expressed in plain and unmistakable terms. *Columbus* v. *Mercantile Trust Co.,* 218 U. S. 645, 658; *Missouri* v. *Kansas Gas Co.,* 265 U. S. 298; *Public Utilities Comm.* v. *Landon,* 249 U. S. 236; *Pennsylvania Gas Co.* v. *Public Serv. Comm.,* 252 U. S. 23; *Texas* v. *White,* 7 Wall. 700, 725; *New York* v. *Miln,* 11 Pet. 102, 139; *Minnesota Rate Cases,* 230 U. S. 352, 402; *Lake Shore, etc. Ry. Co.* v. *Ohio,* 173 U. S. 285; *Hennington* v. *Georgia,* 163 U. S. 299, 317; *Crossman* v. *Lurman,* 192 U. S. 189; *Plumley* v. *Massachusetts,* 155 U. S. 461; *In re Rahrer,* 140 U. S. 545, 554; *Mutual Loan Co.* v. *Martell,* 222 U. S. 225, 233; *Cummings* v. *Chicago,* 188 U. S. 410, 430; *Savage* v. *Jones,* 225 U. S. 501; *Missouri Kans. & Tex. Ry. Co.* v. *Haber,* 169 U. S. 613, 623; *Reid* v. *Colorado,* 187 U. S. 137, 148; *Sinnot* v. *Davenport,* 22 How. 227, 243; *Missouri Pac. Ry. Co.* v. *Larabee Flour Mills Co.,* 211 U. S. 612, 623; *Missouri Kans. & Tex. Ry. Co.* v. *Harris,* 234 U. S. 412, 418; *Carey* v. *South Dakota,* 250 U. S. 118, 122; *Houston, etc. Ry. Co.* v. *United States,* 234 U. S. 342; *Illinois Cent. R. R. Co.* v. *Public Utilities Comm.,* 245 U. S. 493, 510; *Sligh* v. *Kirkwood,* 237 U. S. 52, 60; *Hammer* v. *Dagenhart,* 247 U. S. 251, 273, 275, 276; *Child Labor Tax Case,* 259 U. S. 20, 37.

Congress has otherwise by legislation indicated that it was not its intention to prohibit the operation of appellant's diversion works, or that any act of any of its officers should have that effect. *United States* v.

*Chandler-Dunbar Co.,* 229 U. S. 53; *International Bridge Co.* v. *New York,* 254 U. S. 126, 131; *West Chicago Street R. R. Co.* v. *Chicago,* 201 U. S. 506, 527.

V. Appellee has invited and acquiesced in the construction of the canal to divert the water.

It is estopped now to deny the right. *Missouri* v. *Illinois,* 200 U. S. 496, 526; *United States* v. *Pennsylvania Dock Co.,* 272 Fed. 839, 848; *United States* v. *Osage County,* 254 Fed. 570, 573; *United States* v. *Debell,* 227 Fed. 775, 779; *United States* v. *Midway Oil Co.,* 232 Fed. 619, 631; *United States* v. *Chandler-Dunbar Co.,* 152 Fed. 41, 81; *Monongahela Nav. Co.* v. *United States,* 148 U. S. 312, 334; *Hemmer* v. *United States,* 204 Fed. 898, 901; *Iowa* v. *Carr,* 191 Fed. 257, 266.

As for the treaty between the United States and Great Britain of January 11, 1909, relating to Canadian boundary waters,—when the treaty was made, the right to divert this water by appellant and the State of Illinois was recognized. That right was not in any respect curbed. The treaty expressly eliminates from its terms by the preliminary article, Lake Michigan. Lake Michigan is not a boundary water, as defined by the treaty.

Article II of the treaty reserves to each of the parties, or to the state governments, or provincial governments, as the case may be, all rights over these nonboundary waters. And again, in Art. III, it is stated: ". . . nor are such provisions intended to interfere with the ordinary use of such waters for domestic and sanitary purposes." Article VIII expressly provides that the uses for domestic and sanitary purposes shall be paramount.

The treaty thus completely protects the diversion at Chicago. There was no dispute between the United States and the Dominion of Canada as to the right to divert 10,000 cubic seconds feet of water from Lake Michigan at Chicago. The International Waterways Commission, which was composed of representatives of the two

governments, settled that. Its two reports of May 3, 1906, and January 4, 1907, were signed by all the members of the Commission—three from the United States and three from Canada. As to the diversion at Chicago, the only question remaining unsettled was whether there should be diverted more than 10,000 cubic seconds feet of water.

Article II thus left unhampered the power of the sovereign over the waters that were not boundary waters within the sovereign's territory, subject only—(1) to the right of the citizens of one country to sue in the courts of the other country for damages caused by a diversion not then existing; (2) to the right merely of either party to object to further diversions than those which existed, to the injury of navigation. The Chicago diversion to the amount of 10,000 seconds feet was found by the International Waterways Commission to be an existing diversion. The right of the sovereign having jurisdiction over Lake Michigan, a nonboundary water, subject to the conditions mentioned, was thus reserved. As to those waters, the sovereign could do anything with them it chose. *The Exchange,* 7 Cr. 116, 136. See also opinion of Judson Harmon on right of United States in the Rio Grande, 21 Ops. Atty. Gen. 274, 280.

The waters which are diverted from Lake Michigan at Chicago are wholly within the limits of the State of Illinois.

The treaty is the law of the land, and may properly be said to have been made, so far as the Chicago diversion is concerned, for the benefit of the State of Illinois and the appellant. The State or the appellant may compel the recognition of such contract right. The treaty reserved the right of the sovereign—and the State is a complete sovereign except as to those things delegated to the Federal Government—over these waters. At least the United States, by making the treaty, must be

construed to have acquiesced and consented to the diversions as they existed at the time, unless some definite action were taken by Congress indicating a different intention.

VI. No witness was produced by appellee to testify that lowering of the lake surfaces, or damage to commerce, was ever actually observed. Appellee's case depends entirely upon an inference of the unseen and the subtle analyses of expert witnesses, which cannot form the basis of an injunctional decree. *Missouri* v. *Illinois*, 200 U. S. 496, 523; Joyce on Nuisances, 1906, ed., §§ 299 420; *Salvin* v. *North Brancepeth Coal Co.* L. R. 9, Ch. App. 705, 709; *North Dakota* v. *Minnesota*, 263 U. S. 365.

The injunction should not have been entered unless the injury and damage to commerce was material and the obstruction to navigation was unreasonable. *United States* v. *Rio Grande Co.*, 174 U. S. 690, 709; *Corrigan Transit Co.* v. *Sanitary District*, 137 Fed. 851, 857; *Lake Shore etc. Ry. Co.* v. *Ohio*, 173 U. S. 285, 294; *Cummings* v. *Chicago*, 188 U. S. 410, 428; *Union Bridge Co.* v. *United States*, 204 U. S. 364, 365, 385, 400.

It must appear, in a case of this character, that an unreasonable obstruction and damage to commerce clearly exist. *New York* v. *New Jersey*, 256 U. S. 296, 309; *Kansas* v. *Colorado*, 206 U. S. 46, 117; *Attorney General* v. *Mayor*, 13 Weekly Reporter, 1863–1865, 888; *Mississippi, etc. R. R. Co.* v. *Ward*, 2 Black, 485, 495; 2 Story, Com. on Eq., 203, 204.

VII. If it appear that the granting of an injunction would cause comparatively greater injury to the defendant than 'benefit to the complainant, a court of equity will not hesitate to deny the relief. 1 Joyce on Injunctions, § § 20, 25; *Kansas* v. *Colorado*, 206 U. S. 46, 117; *Georgia* v. *Tennessee Copper Co.*, 206 U. S. 230, 237; *Dun* v. *Lumbermen's Credit Assn.*, 209 U. S. 20;

*McCarthy* v. *Bunker Hill Co.,* 164 Fed. 927; *New York* v. *Pine,* 185 U. S. 93.

VIII. The statute does not authorize the Secretary to make any findings or conclusions. If it did, they would be subject to review. *Philadelphia Co.* v. *Stimson,* 223 U. S. 605, 620; *Hardin* v. *Jordan,* 140 U. S. 371; *Rosenberger* v. *Harris,* 136 Fed. 1001, 1002; *United States* v. *United Verde Copper Co.,* 196 U. S. 207, 215; *School of Magnetic Healing* v. *McAnnulty,* 187 U. S. 94, 110.

In any event, Secretary Stimson's findings and conclusions were erroneous. *Corrigan Transit Co.* v. *Sanitary District,* 137 Fed. 851, 855; *Mortell* v. *Clark,* 272 Ill. 201; *United States* v. *Rio Grande Co.,* 174 U. S. 690.

IX. The lower court should have granted the motion that the appellant be enjoined from taking in excess of 10,000 cubic seconds feet of water from Lake Michigan on condition that appellant pay the cost of constructing such compensating or regulating works as the United States should provide to be built to offset for the claimed lowering of the lake surfaces and their connecting channels due to 10,000 seconds feet diversion at Chicago. Admitting, for the sake of argument, only, all contentions of appellee to be true, appellant cannot be enjoined from taking an amount of water materially less than 10,000 cubic seconds feet, until appellant and cities and towns within its limits can, if at all, readjust their works of sewage disposal and of purification of water supply to suit the changed conditions.

The decree absolutely enjoined appellant from withdrawing from Lake Michigan in excess of 4,167 seconds feet. The Secretary of War would be powerless under it to authorize any further diversion.

This matter should be settled by Congress. *New York* v. *New Jersey,* 256 U. S. 296, 313; *Virginia* v. *West Virginia,* 246 U. S. 565; Amer. Bar Assn. Journal, February, 1922.

*Mr. Daniel N. Kirby,* with whom *Mr. Edward J. Brundage,* Attorney General of Illinois, *Mr. Jesse W. Barrett,* Attorney General of Missouri, *Mr. J. Frank Thompson,* Attorney General of Tennessee, *Mr. Percy Saint,* Attorney General of Louisiana, and *Mr. Cornelius Lynde* were on the brief, for the States of Illinois, Missouri, Tennessee and Louisiana, the Chamber of Commerce of St. Louis, the Memphis Chamber of Commerce, the New Orleans Board of Trade, the New Orleans Association of Commerce, the Mississippi Valley Association, and the Chicago Association of Commerce, as *amici curiae,* by special leave of Court.

*Mr. Solicitor General Beck* and *Mr. Joseph B. Fleming,* Special Assistant to the Attorney General, with whom *Mr. Attorney General Stone* and *Mr. Louis B. Caldwell,* Special Assistant to the Attorney General, were on the brief, for the United States.

I. The Great Lakes, their connecting waters, and the St. Lawrence River, are navigable waters of the United States (*The Genesee Chief,* 12 How. 443; *United States* v. *Rodgers,* 150 U. S. 249; *Illinois Cent. R. R. Co.* v. *Illinois,* 146 U. S. 387,) and also " international waters, being dedicated in perpetuity to the common navigation of all the inhabitants " of the countries on both sides of the boundary, I Moore, Int. Law Dig., p. 675; I Hyde, Int. Law, 1922, pp. 320, 321; *The Genesee Chief,* 12 How. 443; *Moore* v. *American Transp. Co.,* 24 How. 1, 37, 38; *United States* v. *Rodgers,* 150 U. S. 249, 258; *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53.

Their international character is confirmed by the Boundary Waters Treaty of January 11, 1909. Lake Michigan is likewise given an international character by the covenant in Art. I, that the free and open navigation provided for with respect to the boundary waters "shall extend to the waters of Lake Michigan."

II. The level of the Great Lakes and the diversion of water from the St. Lawrence River basin to the Mississippi basin are both subjects of commerce regulation, national (and also international) in character, such as to require exclusive control by Congress. Independently, therefore, of any assertion of control by Congress, the Illinois Act of 1889, in so far as it authorized and directed the appellant to do the acts here complained of without authorization of Congress, was void.·

Appellant reiterates that its acts were "affirmatively authorized by law" within the meaning of § 10 of the Act of September 19, 1890;· but the Act of March 3, 1899, was enacted nearly a year before the appellant (under the permit of May 8, 1899) accomplished a connection between its channel and the Chicago River and thereby diverted water from Lake Michigan. The basis for this contention, however, is a misapplication of the decision in *United States* v. *Bellingham Bay Co.*, 176 U. S. 211,—which held that in the case of an obstruction of a navigable stream confined wholly within the boundaries of a State, the words "affirmatively authorized by law" in the Act of 1890 included lawful authorization by an act of the state legislature. Manifestly, an obstruction of a navigable water like Lake Michigan or the Ohio and Mississippi Rivers could not lawfully be authorized by legislation of a single State either before or after the enactment of the Act of 1890.

It makes no difference whether interference with that control proceeds from a state statute or from the acts of individuals. *Kansas City So. Ry. Co.* v. *Kaw Valley District*, 233 U. S. 75, 78.

Those subjects of interstate commerce which require a general system or uniformity of regulation are national in character, and as to such the power of Congress is exclusive; those admitting of diversity of treatment according to local conditions are local in character, and as to

such the States may act within their respective jurisdictions until Congress sees fit to act. *Minnesota Rate Cases,* 230 U. S. 352; *Covington Bridge Co.* v. *Kentucky,* 154 U. S. 204; *Wilmington Transp. Co.* v. *Railroad Commission,* 236 U. S. 151.

Until Congress asserted its paramount control, the subject of obstructions to the navigable capacity of state navigable waters, not affecting navigable waters without the State, was deemed to be local in character and subject to the authority of the State. See, (1), cases involving dams across state navigable waters; *Willson* v. *Black-bird Creek Co.,* 2 Pet. 245; *Pound* v. *Turck,* 95 U. S. 459; *Huse* v. *Glover,* 119 U. S. 543; and *Monongahela Nav. Co.* v. *United States,* 148 U. S. 312; (2), cases involving bridges across state navigable waters; *Gilman* v. *Philadelphia,* 3 Wall. 713; *Escanaba Co.* v. *Chicago,* 107 U. S. 683; *Cardwell* v. *American Bridge Co.,* 113 U. S. 205; *Hamilton* v. *Vicksburg, etc. R. R.,* 119 U. S. 280; *Willamette Bridge Co.* v. *Hatch,* 125 U. S. 1; and *Lake Shore, etc. Ry. Co.* v. *Ohio,* 165 U. S. 365; (3), cases involving improvement of state navigable waters; *Withers* v. *Buckley,* 20 How. 84; *Sands* v. *Manistee Co.,* 123 U. S. 288. See *Huse* v. *Glover,* 119 U. S. 543.

The power of the States with respect to interstate navigable waters has at all times been limited to matters purely local in character, incidental to and aiding commerce, and not affecting navigation elsewhere. The cases fall into four fairly well-defined classes: (1), the regulation of pilotage, *Cooley* v. *Board of Wardens,* 12 How. 299; (2), protection of coasts and improvement of harbors, bays, and streams, *Mobile County* v. *Kimball,* 102 U. S. 691; (3), quarantine and inspection laws and the policing of harbors, *Morgan's S. S. Co.* v. *Louisiana Board of Health,* 118 U. S. 455; (4), regulation of wharves, piers, and docks, *Transportation Co.* v. *Parkersburg,* 107 U. S. 691.

Obstructions to the navigable capacity of interstate waters without authority from Congress have always been held unlawful, *Pennsylvania* v. *Wheeling Bridge Co.,* 13 How. 518; *Bridge Co.* v. *United States,* 105 U. S. 470; *Miller* v. *Mayor of New York,* 109 U. S. 385; *Covington Bridge Co.* v. *Kentucky,* 154 U. S. 204; *Kansas City So. Ry. Co.* v. *Kaw Valley District,* 233 U. S. 75; *Gibbons* v. *Ogden,* 9 Wheat. 190; *Brown* v. *Maryland,* 12 Wheat. 419; *Henderson* v. *Mayor of New York,* 92 U. S. 259; *Hall* v. *DeCuir,* 95 U. S. 485; *Lord* v. *Steamship Co.,* 102 U. S. 541; *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196; *Philadelphia Co.* v. *Pennsylvania,* 122 U. S. 326; *Sault Ste. Marie* v. *International Transit Co.,* 234 U. S. 333.

The subject of the levels of the Great Lakes does not permit of diversity of treatment according to the local requirements of cities on their shores. What Chicago can do, so can Milwaukee, Toledo, and Cleveland. *Pennsylvania* v. *West Virginia,* 262 U. S. 553, 596.

Under the compact contained in Art. IV of the Ordinance of 1787, Illinois may not interfere with or decrease the navigable capacity of Lake Michigan or any of the other Great Lakes. *Economy Light Co.* v. *United States,* 256 U. S. 113, 118; *Pennsylvania* v. *Wheeling Bridge Co.,* 13 How. 518.

On the other hand, in such cases as *Escanaba Co.* v. *Chicago,* 107 U. S. 678; *Cardwell* v. *American Bridge Co.,* 113 U. S. 205; *Huse* v. *Glover,* 119 U. S. 543; *Hamilton* v. *Vicksburg, etc. R. R.,* 119 U. S. 280; *Sands* v. *Manistee Co.,* 123 U. S. 288; and *Willamette Bridge Co.* v. *Hatch,* 125 U. S. 1, this Court held the compact inapplicable to obstructions over navigable waters entirely within the boundaries of a single State.

The principle to be extracted from these cases is that where the obstruction or restriction of navigability is that of a state navigable water, the compact does not

apply; where it is of an interstate navigable water such as the Ohio River or the Great Lakes, the compact is, and has always been in force.

The subject of the levels of and diversion of waters from the Great Lakes is necessarily national because international in character, and therefore for the exclusive control of Congress. *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53; *Lord* v. *Steamship Co.*, 102 U. S. 541, 544; *Henderson* v. *Mayor of New York*, 92 U. S. 259; I Hyde, Int. Law, pp. 313–316.

III. The purposes for which the States might formerly exercise their limited power all came within the scope of the police power. In some cases it was for the protection of public health, *Willson* v. *Black-bird Creek Marsh Co.*, 2 Pet. 245; *Morgan's S. S. Co.* v. *Louisiana Board of Health*, 118 U. S. 455; in some for furthering of commerce, *Pound* v. *Turck*, 95 U. S. 459; in some for improvement of rivers or harbors, *Mobile County* v. *Kimball*, 102 U. S. 691; *Sands* v. *Manistee Co.*, 123 U. S. 288; in some for public convenience and commerce, as a bridge, *Gilman* v. *Philadelphia*, 3 Wall. 724; *Escanaba Co.* v. *Chicago*, 107 U. S. 683.

By the Acts of 1890 and 1899 Congress made an effectual assertion of its paramount control over all navigable waters of the United States and assumed jurisdiction of the subjects mentioned above. *United States* v. *Rio Grande Co.*, 174 U. S. 690. See also *Lake Shore, etc. Ry. Co.* v. *Ohio*, 165 U. S. 365; *United States* v. *Bellingham Bay Co.*, 176 U. S. 211; *Cummings* v. *Chicago*, 188 U. S. 410; *Union Bridge Co.* v. *United States*, 204 U. S. 364; *Philadelphia Co.* v. *Stimson*, 223 U. S. 635; *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53; *Economy Light Co.* v. *United States*, 256 U. S. 113; *Southern Pac. Co.* v. *Olympian Co.*, 260 U. S. 205.

There has been no undue delegation of power to the Secretary of War. *Union Bridge Co.* v. *United States*,

204 U. S. 364; *Philadelphia Co.* v. *Stimson,* 223 U. S. 635.

The effect of § 10 of the Act of 1899 is to make the creation of such obstructions or modifications dependent " upon the concurrent or joint assent of both the national government and the state government." *Cummings* v. *Chicago,* 188 U. S. 410; *Montgomery* v. *Portland,* 190 U. S. 89; *North Shore Boom Co.* v. *Nicomen Boom Co.,* 212 U. S. 406; *Port of Seattle* v. *Oregon & Washington R. R. Co.,* 255 U. S. 56; *International Bridge Co.* v. *New York,* 254 U. S. 126.

Under § 10 of the Act of 1899, an act of Congress is necessary to authorize the creation of an obstruction to the navigable capacity of a navigable water of the United States; for a modification of the condition, etc., of such navigable water, not amounting to an obstruction, the recommendation of the Chief of Engineers and the authorization of the Secretary of War are necessary. *Hubbard* v. *Fort,* 188 Fed. 987; *West Chicago Street R. R. Co.* v. *Chicago,* 201 U. S. 506. Distinguishing *Maine Water Co.* v. *Knickerbocker Co.,* 99 Me. 473.

Whether the entire navigable capacity, and whether the unmodified condition of a navigable water, should be conserved for the use and safety of navigation, are questions legislative in character, and their determination by Congress is conclusive. *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53, 62; *Southern Pac. Co.* v. *Olympian Co.,* 260 U. S. 205; *Monongahela Bridge Co.* v. *United States,* 216 U. S. 177; *Philadelphia Co.* v. *Stimson,* 223 U. S. 605, 635, 638. See also *Pennsylvania* v. *Wheeling Bridge Co.,* 18 How. 421; *Union Bridge Co.* v. *United States,* 204 U. S. 364; *Gibson* v. *United States,* 166 U. S. 269; *Scranton* v. *Wheeler,* 179 U. S. 141; *Chicago, B. & Q. Ry. Co.* v. *Drainage Commrs.,* 200 U. S. 561; *West Chicago Street R. R. Co.* v. *Chicago,* 201 U. S. 506; *Hannibal Bridge Co.* v. *United States,* 221 U. S. 194.

IV. Appellant has created and is maintaining an obstruction to the navigable capacity of navigable waters of the United States in violation of § 10 of the Act of Congress of March 3, 1899.

To constitute an obstruction, neither material injury and damage to commerce nor unreasonable obstruction to navigation are necessary. *Economy Light Co.* v. *United States*, 256 U. S. 113; *United States* v. *Chandler–Dunbar Co.*, 229 U. S. 53; *Pennsylvania* v. *Wheeling Bridge Co.*, 13 How. 553; *Hubbard* v. *Fort*, 188 Fed. 992. Distinguishing, *Union Bridge Co.* v. *United States*, 204 U. S. 364; *New York* v. *New Jersey*, 256 U. S. 296; *Kansas* v. *Colorado*, 206 U. S. 46; *Mississippi, etc. R. R. Co.* v. *Ward*, 2 Black, 485.

V. The obstructions have never been affirmatively authorized by Congress, as required by § 10 of the Act of March 3, 1899.

The authority in the Acts of March 30, 1822, and March 2, 1827, was for the construction of a particular canal, the location of which was to be determined by law, and for the purpose of navigation, not sanitation.

Sections 7 and 10 of the Act of September 19, 1890, and § 10 of the Act of March. 3, 1899, made unlawful any greater diversion than was practiced in 1890. *United States* v. *Rio Grande Co.*, 174 U. S. 690.

The Niagara Falls Act of 1906 did not constitute such authorization; if anything, it forbade the unauthorized diversion.

The Canadian Boundary Waters Treaty of January 11, 1909, did not constitute such authorization; instead, it forbade any diversion over 4,167 cubic seconds feet.

VI. Appellant's diversion in excess of 4,167 cubic seconds feet has not been recommended by the Chief of Engineers nor authorized by the Secretary of War, as required by § 10 of the Act of March 3, 1899.

Appellant, having applied for and accepted the various permits, is estopped.

The Secretary of War may impose conditions on permits granted by him under § 10 of the Act of March 3, 1899, and may revoke or modify such permits on non-fulfillment of these conditions. *Southern Pac. Co.* v. *Olympian Co.*, 260 U. S. 205.

VII. Appellant's unauthorized diversion cannot be justified as an exercise of the police power.

On a subject of interstate commerce national in character and requiring exclusive control by Congress, there can be no reserved police power in the State to invade that control even for the protection of public health. *Henderson* v. *Mayor of New York*, 92 U. S. 259; *Kansas City So. Ry. Co.* v. *Kaw Valley District*, 233 U. S. 75.

On all other subjects of interstate commerce, when Congress has asserted its paramount control, there is no police power reserved in the State to invade it. *Morgan's S. S. Co.* v. *Louisiana Board of Health*, 118 U. S. 455, 464. See also *Compagnie Francaise* v. *Louisiana Board of Health*, 186 U. S. 380; *Louisiana* v. *Texas*, 176 U. S. 1, 19; *Mobile County* v. *Kimball*, 102 U. S. 691, 697–699; *Wisconsin* v. *Duluth*, 96 U. S. 379.

VIII. The right of appellee to an injunction is not barred by laches, acquiescence, or estoppel.

Section 12 of the Act of March 3, 1899, is sufficient authority for this suit. *Economy Light Co.* v. *United States*, 256 Fed. 792, 793; s. c. 256 U. S. 113.

Congress intended by the Act of March 3, 1899, to extend, not to limit, the scope of federal control over obstructions and modifications of the navigable capacity of navigable waters.

In the Act of 1890, § 10 provided that injunction proceedings might be instituted to enjoin obstructions. Section 12 of the Act of 1899 was intended to have a broader scope and to cover all structures in violation of §§ 9, 10, 11, whether the structures amounted to, or caused, obstructions, or were merely unlawful modifications of the

condition of a navigable water, not amounting to obstructions.

Independently of § 12, there is sufficient authority for the instant suit. *In re Debs,* 158 U. S. 564; *Pennsylvania* v. *Wheeling Bridge Co.,* 13 How. 518; *United States* v. *San Jacinto Tin Co.,* 125 U. S. 273; *United States* v. *American Bell Tel. Co.,* 128 U. S. 315; *Gilman* v. *Philadelphia,* 3 Wall. 713; *Louisiana* v. *Texas,* 176 U. S. 1, 19; *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290; *Missouri* v. *Illinois,* 180 U. S. 208, 236; *Northern Securities Co.* v. *United States,* 193 U. S. 197, 356.

The doctrine of comparative injury has no application. *Ruppert* v. *Caffey,* 251 U. S. 264; *In re Debs,* 158 U. S. 564, 582; 31 L. R. A. (N. S.) 881; *Union Bridge Co.* v. *United States,* 204 U. S. 401.

Under the terms of the Treaty of January 11, 1909, the construction of such compensating works as the appellant proposes cannot be undertaken without the approval of the International Joint Commission.

The decree which appellant proposes would be void and inoperative, in that it would contain a condition which the Court would be powerless to enforce. The construction of submerged weirs in the Niagara and St. Clair Rivers may never be authorized by Congress. Even if so authorized, they may never be permitted by the International Joint Commission. If authorized, they may cost many times what the appellant has in mind or is able to pay. *Kansas City So. Ry. Co.* v. *Kaw Valley District,* 233 U. S. 75, 77–78.

*Mr. Andrew B. Dougherty,* Attorney General of Michigan, for the States of Michigan, Indiana, Minnesota, New York, Ohio, Pennsylvania, and Wisconsin, as *amici curiae,* by special leave of Court. *Messrs. U. S. Lesh,* Attorney General of Indiana; *Henry S. Sweeny,* Assistant

Attorney General of Michigan; *Clifford L. Hilton,* Attorney General of Minnesota; *Carl Sherman,* Attorney General, and *Edward G. Griffin* and *C. S. Ferris,* Deputy Attorneys General, of New York; *C. C. Crabbe,* Attorney General of Ohio; *Geo. W. Woodruff,* Attorney General, and *Phillip Wells,* Deputy Attorney General, of Pennsylvania; and *Herman L. Ekern,* Attorney General of Wisconsin, were also on the brief.

*Mr. Harvey D. Goulder* for the Lake Carriers' Association as *amicus curiae,* by special leave of Court.

*Mr. Francis X. Busch* and *Mr. Leon Hornstein,* by leave of Court, filed a brief on behalf of the City of Chicago, as *amicus curiae.*

MR. JUSTICE HOLMES delivered the opinion of the Court.

This is a bill in equity brought by the United States to enjoin the Sanitary District of Chicago, a corporation of Illinois, from diverting water from Lake Michigan in excess of 250,000 cubic feet per minute; the withdrawal of that amount having been authorized by the Secretary of War. It is alleged that the withdrawal of more, viz., from 400,000 to 600,000 cubic feet per minute, has lowered and will lower the level of the water of Lake Michigan, Lake Huron, Lake St. Clair, Lake Erie, Lake Ontario, Sault Ste. Marie, St. Mary's River, St. Clair River, Detroit River, Niagara River, St. Lawrence River, and all the harbors, &c., connected therewith, all of which are alleged to be navigable waters of the United States, and will thus create an obstruction to the navigable capacity of said waters; and that it will alter and modify the condition and capacity of the above named and their ports, &c., connected with them. The prohibition of such alterations and obstructions in the Act of March 3,

1899, c. 425, § 10; 30 Stat. 1121, 1151, is set out at length
and relied upon but the frame of the bill does not ex-
clude a reliance upon more general principles if they
were needed in order to maintain it.

The withdrawal practised and threatened is through
an artificial channel that takes the place of the Chicago
River, formerly a little stream flowing into Lake Michi-
gan, and of a part of its branches. The channel instead
of adding water to the Lake has been given an opposite
incline, takes its waters from the Lake, flows into the Des-
plaines River, which empties into the Illinois River,
which in its turn empties into the Mississippi. The
channel is at least twenty-five feet deep and at least one
hundred and sixty-two feet wide; and while its interest
to the defendant is primarily as a means to dispose of
the sewage of Chicago, Missouri v. Illinois, 200 U. S. 496,
it has been an object of attention to the United States
as opening water communication between the Great
Lakes and the Mississippi and the Gulf.

The answer shows that the defendant is proceeding
under a state act of May 29, 1889, by which it was pro-
vided that a channel should be made of size sufficient to
take care of the sewage and drainage of Chicago as the
increase of population might require, with a capacity to
maintain an ultimate flow of not less than 600,000 cubic
feet of water per minute, and a continuous flow of not
less than 20,000 cubic feet for each 100,000 of the popu-
lation within the sanitary district. It denies that the
defendant has abstracted from 400,000 to 600,000 feet
per minute, but as it alleges the great evils that would
ensue if the flow were limited to the amount fixed by the
Secretary of War or to any amount materially less than
that required by the state act of May 29, 1889, and as it
admits present conditions to be good, the denial cannot
be taken very seriously. The act sufficiently indicates
what the State threatens and intends to do unless

stopped. The answer also denies that the abstraction of water substantially in excess of 250,000 cubic feet per minute will lower the levels of the Lakes and Rivers concerned or create an obstruction to the navigable capacity of those waters. It goes into the details of the construction of the channel; the expenses incurred; and the importance of it to the health of the inhabitants of Chicago, both for the removal of their sewage and avoiding the infection of their source of drinking water in Lake Michigan which had been a serious evil before. It shows the value of the channel for the great scheme of navigation that we have mentioned; recites acts of Congress and of officers of the United States alleged to authorize what has been done, and to estop the United States from its present course, and finally takes the bull by the horns and denies the right of the United States to determine the amount of water that should flow through the channel or the manner of the flow.

This brief summary of the pleadings is enough to show the gravity and importance of the case. It concerns the expenditure of great sums and the welfare of millions of men. But cost and importance, while they add to the solemnity of our duty, do not increase the difficulty of decision except as they induce argument upon matters that with less mighty interests no one would venture to dispute. The law is clear, and when it is known the material facts are few.

This is not a controversy between equals. The United States is asserting its sovereign power to regulate commerce and to control the navigable waters within its jurisdiction. It has a standing in this suit not only to remove obstruction to interstate and foreign commerce, the main ground, which we will deal with last, but also to carry out treaty obligations to a foreign power bordering upon some of the Lakes concerned, and, it may be, also on the footing of an ultimate sovereign interest in the Lakes.

19458°—25——31

The Attorney General by virtue of his office may bring this proceeding and no statute is necessary to authorize the suit. *United States* v. *San Jacinto Tin Co.*, 125 U. S. 273. With regard to the second ground, the Treaty of January 11, 1909, with Great Britain, expressly provides against uses ' affecting the natural level or flow of boundary waters' without the authority of the United States or the Dominion of Canada within their respective jurisdictions and the approval of the International Joint Commission agreed upon therein. As to its ultimate interest in the Lakes the reasons seem to be stronger than those that have established a similar standing for a State, as the interests of the nation are more important than those of any State. *In re Debs,* 158 U. S. 564, 584, 585, 599. *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230. *Hudson County Water Co.* v. *McCarter,* 209 U. S. 349, 355. *Marshall Dental Manufacturing Co.* v. *Iowa,* 226 U. S. 460, 462.

The main ground is the authority of the United States to remove obstructions to interstate and foreign commerce. There is no question that this power is superior to that of the States to provide for the welfare or necessities of their inhabitants. In matters where the States may act the action of Congress overrides what they have done. *Monongahela Bridge Co.* v. *United States,* 216 U. S. 177. *Second Employers' Liability Cases,* 223 U. S. 1, 53. But in matters where the national importance is imminent and direct even where Congress has been silent the States may not act at all. *Kansas City Southern Ry. Co.* v. *Kaw Valley Drainage District,* 233 U. S. 75, 79. Evidence is sufficient, if evidence is necessary, to show that a withdrawal of water on the scale directed by the statute of Illinois threatens and will affect the level of the Lakes, and that is a matter which cannot be done without the consent of the United States, even were there no international covenant in the case.

But the defendant says that the United States has given its assent to all that has been done and that it is estopped to take the position that it now takes. A State cannot estop itself by grant or contract from the exercise of the police power. *Texas & New Orleans R. R. Co.* v. *Miller,* 221 U. S. 408, 414. *Atlantic Coast Line R. R. Co.* v. *Goldsboro,* 232 U. S. 548, 558. *Denver & Rio Grande R. R. Co.* v. *Denver,* 250 U. S. 241, 244. It would seem a strong thing to say that the United States is subject to narrower restrictions in matters of national and international concern. At least it is true that no such result would be reached if a strict construction of the Government's act would avoid it. This statement was made and illustrated in a case where it was held that an order of the Secretary of War under the Act of March 3, 1899, c. 425, the same act in question here, directing an alteration in a bridge must be obeyed, and obeyed without compensation, although the bridge had been built in strict accord with an act of Congress declaring that if so built it should be a lawful structure. *Louisville Bridge Co.* v. *United States,* 242 U. S. 409, 417. *Greenleaf Johnson Lumber Co.* v. *Garrison,* 237 U. S. 251. It only remains to consider what the United States has done. And it will be as well to bear in mind when considering it that this suit is not for the purpose of doing away with the channel, which the United States, we have no doubt, would be most unwilling to see closed, but solely for the purpose of limiting the amount of water to be taken through it from Lake Michigan.

The defendant in the first place refers to two acts of Congress: one of March 30, 1822, 3 Stat. 659, which became ineffectual because its conditions were not complied with, and another of March 2, 1827, c. 51, 4 Stat. 234, referred to, whether hastily or not, in *Missouri* v. *Illinois,* 200 U. S. 496, 526, as an act in pursuance of which Illinois brought Chicago into the Mississippi watershed. The

act granted land to Illinois in aid of a canal to be opened by the State for the purpose of uniting the waters of the Illinois River with those of Lake Michigan, but if it has any bearing on the present case it certainly vested no irrevocable discretion in the State with regard to the amount of water to be withdrawn from the Lake. It said nothing on that subject. We repeat that we assume that the United States desires to see the canal maintained and therefore pass by as immaterial all evidence of its having fostered the work. Even if it had approved the very size and shape of the channel by act of Congress it would not have compromised its right to control the amount of water to be drawn from Lake Michigan. It seems that a less amount than now passes through the canal would suffice for the connection which the United States has wished to establish and maintain.

In an appropriation Act of March 3, 1899, c. 425, § 10; 30 Stat. 1121, 1151; Congress provided " That the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited; . . . and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of War prior to beginning the same." By § 12 violation of the law is made a misdemeanor and punished, and the removal of prohibited structures may be enforced by injunction of the proper Court of the United States in a suit under the direction of the Attorney General. This statute repeatedly has been held to be constitutional in respect of the power given to the Secretary of War. *Louisville Bridge Co. v. United States,* 242 U. S.

409, 424. It is a broad expression of policy in unmistakable terms, advancing upon an earlier Act of September 19, 1890, c. 907, § 10; 26 Stat. 426, 454, which forbade obstruction to navigable capacity " not affirmatively authorized by law," and which had been held satisfied with regard to a boom across a river by authority from a State. *United States* v. *Bellingham Bay Boom Co.,* 176 U. S. 211. There is neither reason nor opportunity for a construction that would not cover the present case. As now applied it concerns a change in the condition of the Lakes and the Chicago River, admitted to be navigable, and, if that be necessary, an obstruction to their navigable capacity, *United States* v. *Rio Grande Dam & Irrigation Co.,* 174 U. S. 690, without regard to remote questions of policy. It is applied prospectively to the water henceforth to be withdrawn. This withdrawal is prohibited by Congress, except so far as it may be authorized by the Secretary of War.

After this statute was passed the Secretary of War granted various permits, which are relied on by the appellant although in their nature they all were revocable licenses. On May 8, 1899, the Secretary, on application of the appellant, granted permission to open the channel, assumed in the recitals to have a flowage capacity of 300,000 cubic feet per minute with a velocity of one and one-quarter miles an hour, on the conditions that the permit should be subject to the action of Congress (which was superfluous except as a warning); that if at any time the current created proved to be unreasonably obstructive to navigation or injurious to property he reserved the right to close or modify the discharge; and that the Sanitary District must assume all responsibility for damages to property and navigation interests by reason of the introduction of a current in Chicago River. On July 11, 1900, improvements of the Chicago River were permitted with the statement that the permission did not affect the

right of the Secretary 'to revoke the permit of May 8, 1899. On April 9, 1901, the Secretary, Mr. Root, directed the Sanitary District to cut down the discharge to 200,000 cubic feet per minute. On July 23, 1901, at the appellant's request, he amended the order to permit a flow of 300,000 feet between 4 p. m. and twelve, midnight, subject to revocation. On December 5, 1901, again on the application of the appellant, leave was given to discharge not exceeding 250,000 feet per minute during the whole twenty-four hours, but subject to such modification as the Secretary might think that the public interests required. On January 17, 1903, the allowance was increased to 350,000 feet until March 31, 1903, after which date it was to be reduced again to 250,000 feet all subject to modification as before. On September 11, 1907, and on June 30, 1910, permissions were granted to make another connection with Lake Michigan and to open a channel through Calumet River (this last refused by Mr. Secretary Taft on March 14, 1907) on the understanding that the total quantity of water withdrawn from the Lake should not exceed that already authorized by the Secretary of War. Finally on February 5, 1912, the appellant, setting forth that the population of the Sanitary District exceeded 2,500,000 and was increasing rapidly, and that the only method then available for disposing of the sewage of this population was by diluting it with water flowing from Lake Michigan through the canal, asked permission to withdraw not exceeding 10,000 cubic feet per second, subject to such restrictions and supervision as might seem proper to the Secretary and to revocation by him. On January 8, 1913, Mr. Secretary Stimson carefully reviewed the situation, including the obvious fact that so large a withdrawal would lower the levels of the Lakes and the overwhelming evidence that it would affect navigation, and held that he was not warranted in excepting the appellant from the prohibition of

Congress on the ground of even pressing sanitary needs. It appears to us that the attempt to found a defence upon the foregoing licenses is too futile to need reply.

States bordering on the Mississippi allowed to file briefs as *amici curiae* suggest that they were not heard and that rights have not been represented before the Secretary of War. The City of Chicago makes a similar complaint and argues that it is threatened with the loss of a hundred million dollars. The interest that the River States have in increasing the artificial flow from Lake Michigan is not a right, but merely a consideration that they may address to Congress, if they see fit, to induce a modification of the law that now forbids that increase unless approved as prescribed. The investment of property in the canal and the accompanying works took the risk that Congress might render it valueless by the exercise of paramount powers. It took the risk without even taking the precaution of making it as sure as possible what Congress might do. But we repeat that the Secretary by his action took no rights of any kind. He simply refused an application of the Sanitary Board to remove a prohibition that Congress imposed. It is doubtful at least whether the Secretary was authorized to consider the remote interests of the Mississippi States or the sanitary needs of Chicago. All interests seem in fact to have been copiously represented but he certainly was not bound to give them a hearing upon the application upon which he was requested to pass.

After the refusal, in January, 1913, to allow an increase of flow, the appellant was notified by direction of the War Department that it was drawing more water than was allowed and was violating § 10 of the Act of March 3, 1899. In reply it intimated that it was bound by the state law to which we have referred and in obedience to it had been flowing 20,000 cubic feet per minute for each

100,000 of population and could not reduce that flow. It suggested that its rights should be determined by a suit, and accordingly this bill was filed on October 6, 1913. An earlier suit had been brought on March 23, 1908, to prevent the construction of a second channel from Lake Michigan through the Calumet River to the appellant's main channel, leave to do which had been refused as we have seen by Mr. Secretary Taft. (The permit subsequently granted on June 30, 1910, was with the understanding that it should not affect or be used in the 'friendly suit' then pending to determine rights.) The earlier suit was consolidated with the later present one, and it was agreed that the evidence taken in that should be used in this, so far as applicable. There was some delay in concluding the case, which the defendant naturally would desire, but after it was submitted to the Judge according to his own statement he kept it about six years before delivering an oral opinion in favor of the Government on June 19, 1920. No valid excuse was offered for the delay. There was a motion for reconsideration, but the Judge took no further action of any kind until he resigned in 1922. On June 18, 1923, another Judge entered a decree for an injunction as prayed, with a stay of six months to enable the defendant to present the record to this Court.

The parties have come to this Court for the law, and we have no doubt that as the law stands the injunction prayed for must be granted. As we have indicated, a large part of the evidence is irrelevant and immaterial to the issues that we have to decide. Probably the dangers to which the City of Chicago will be subjected if the decree is carried out are exaggerated, but in any event we are not at liberty to consider them here as against the edict of a paramount power. The decree for an injunction as prayed is affirmed, to go into effect in sixty days— without prejudice to any permit that may be issued by the Secretary of War according to law.

*Affirmed.*