380 So.2d 226 (1980)
Irwin BORDELON and Hubert Wiley, Plaintiffs-Appellees,
v.
T. L. JAMES & COMPANY, Defendant-Appellant.
No. 7465.
Court of Appeal of Louisiana, Third Circuit.
January 30, 1980.
*227 J. Fredrick Kessenich, New Orleans, for defendant-appellant.
George Griffing, Jonesville, for plaintiff-appellee.
Before FORET, CUTRER and DOUCET, JJ.
FORET, Judge.
This lawsuit is based on claims for damages due as a result of the alleged negligent acts of the defendant in causing damage to the plaintiffs' fishing nets. The nets were in use in the Red River. The defendant, T. L. James and Company, appeals from a judgment rendered in favor of Mr. Hubert Wiley, plaintiff, awarding damages in the amount of $1,707.42, this sum being the value of twelve hoop fishing nets valued at approximately $140.00 per net and loss of income of $180.00, plus court costs.
The facts reveal that the plaintiff is a commercial fisherman earning his livelihood by fishing with hoop nets on the Red River. The plaintiff claims that his hoop nets were negligently destroyed by the defendant during certain dredging operations by the dredge boat "ARMIDILLO". The defendant was dredging in the area pursuant to a contract with the Department of the Army, Corps of Engineers.
Originally, there were five plaintiffs and all cases were consolidated. All the plaintiffs, except for Mr. Wiley, lost in the trial court because the court found that they were attempting to prove their damages due to faulty navigation of the dredge boat rather than the dredging operations themselves.
The facts further show that Mr. Wiley pulled up his nets and kept them out of the river for several days when he became aware of the fact that dredging operations were to begin in the area where he usually fished. Mr. Wiley's son had worked on the dredge for several days. His son had informed him that the dredge boat would be proceeding south or downstream from the point where they initially were to dredge. *228 This information was confirmed by a navigation bulletin, defendant's exhibit "C", which stated that the dredge would work downstream from the point of beginning. As stated before, in view of this information, Mr. Wiley pulled his nets from the river and kept them on the bank for several days. After the dredge had passed his usual fishing site, he then replaced his nets in the river where he marked them with one-gallon plastic jugs. Shortly thereafter, the dredge boat was required by the Corps of Engineers, with whom the defendant had a contract, to return upstream and dredge out a shallow area which had apparently been omitted or missed during the primary dredging operation. This is where the damage to Mr. Wiley's nets occurred. The crew of the dredge were required to follow the orders of the Corps of Engineers with respect to when and where to dredge.
The first issue presented is whether or not this matter is controlled by Federal law and/or the general maritime law. It is undisputed that the Red River is a navigable water body of the United States and as such, is within the power of Congress to regulate pursuant to Article 1, Section 8 of the United States Constitution. In order for an activity or an occurrence to be governed by Federal or general maritime law, either Congress must have passed legislation making the activity or the occurrence one which is governed by Federal or maritime law, or it is an activity which has maritime locality and a sufficient maritime nexus to mandate its falling under said law.
In order for a wrong to be governed by the admiralty law of the United States, maritime locality plus a significant relationship to traditional maritime activity must be present. Executive Jet Aviation, Inc. v. City of Cleveland, Ohio, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972).
In determining whether there is maritime jurisdiction, circumstances to be considered are functions and roles of parties, types of vehicles and instrumentalities involved, causation and type of injury and traditional concepts of the role of admiralty law. Kelly v. Smith, 485 F.2d 520 (5th Cir. 1973) rehearing denied, 486 F.2d 1403; certiorari denied, Chicot Land Co., Inc. v. Kelly, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974).
In the case at bar, the conduct complained of took place on a navigable water body. The ARMIDILLO is a vessel within the meaning of the general maritime law. Additionally, fishing is a traditional maritime activity. In view of the location, circumstances of the case, roles of the parties, and types of instrumentalities involved, we find that this matter is governed by the general maritime law and applicable Federal law.
A state court is required to apply Federal maritime law in a case within Federal admiralty jurisdiction. Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970); Chelentis v. Luckenbach, S.S. Co., 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171 (1918). Whether a suit is brought in Federal court pursuant to its admiralty jurisdiction or, under the "saving to suitors clause", is brought by ordinary civil action in a non-maritime court, Federal substantive admiralty or maritime law is applicable if the claim is one cognizable in admiralty. U.S.C.A.Const., Article 3, Sec. 2; 28 U.S.C.A. Sec. 1333; Lavergne v. Western Company of North America, Inc., 371 So.2d 807 (La.1979).
Appellant contends that appellee's fishing nets constituted an obstruction within the meaning of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C.A. Sec. 401, et seq. In particular, appellant refers to Section 403 of Title 33, U.S.C.A.[1] This section *229 prohibits the unauthorized building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structure in any navigable water or other water of the United States. A search of the jurisprudence has revealed no case which has held this type of fishing net to be an obstruction as defined by the above mentioned statute. Appellant relies on the case of Alaska Pacific Fisheries v. United States,[2] as being authority to the effect that a fish net is an "other structure" within the meaning of Section 403. In the Alaska Fisheries case, the net or structure which was held to be an obstruction under this statute was an extensive fish trap which was located within an Indian reservation. For this reason we do not think that this case is authority for holding that a fish net is an "other structure" within the meaning of the applicable statute. However, in United States v. Republic Steel Corp.,[3] the court stated:
"The Court in United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 708, 19 S.Ct. 770, 777, 43 L.Ed. 1136, decided not long after the 1890 Act became effective, gave the concept of `obstruction,' as used in Section 10, a broad sweep: `It is not a prohibition of any obstruction to the navigation, but any obstruction to the navigable capacity, and anything, wherever done, or however done, within the limits of the jurisdiction of the United States which tends to destroy the navigable capacity of one of the navigable waters of the United States, is within the terms of the prohibition.' This broad construction given Section 10 of the 1890 Act was carried over to Section 10 of the 1899 Act in Sanitary District Co. of Chicago v. United States, 266 U.S. 405, 429, 45 S.Ct. 176, 179, 69 L.Ed. 352, the Court citing United States v. Rio Grande Dam & Irrigation Co., supra, with approval and saying that Section 10 of the 1899 Act was `a broad expression of policy in unmistakable terms, advancing upon' Section 10 of the 1890 Act."
As noted in the above mentioned case, the term "obstruction" is to be given a broad interpretation in favor of the free and open navigation of the waters of the United States. We do not think that a fish net of the type used by the plaintiff in this case qualifies as an obstruction under all circumstances. However, it may qualify or be defined as an obstruction when used in such a manner as to impede or impair the navigability of the waters of the United States. Nevertheless, the servitude of navigation is paramount to that of fishing or other acts which may be performed in navigable waters. See Scozzafava v. United States, 199 F.Supp. 43 (S.D.N.Y.1961); United States v. 597.75 acres of land, more or less in St. Martin Parish, State of Louisiana, 241 F.Supp. 796 (W.D. La.1965).
Every structure or other obstruction in the water of a navigable river is subordinate to the right of navigation and subject to the obligation to suffer the consequences of the improvement of navigation, and must be removed if Congress, in the assertion of its power over navigation, shall determine that its continuance is detrimental to the public interest in the navigation of the river. United States v. Chandler-Dunbar Water Power Company, 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913).
*230 In view of the above cited jurisprudence and the policy considerations being in favor of the open and free navigation of waters in the United States, we find that the activities in which the defendant was engaged to be of paramount importance. The defendant was under the direct control of the Army Corps of Engineers. Additionally, we find no breach of any duty owed by T. L. James to the plaintiffs which would give rise to actionable negligence.
For the above and foregoing reasons, the judgment of the trial court is reversed, and all costs herein are to be assessed to the plaintiff-appellee, Hubert Wiley.
REVERSED AND RENDERED.
NOTES
[1] 33 U.S.C.A. § 403: Obstruction of navigable waters generally; wharves; piers, etc.; excavations and filling in

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same. March 3, 1899, c. 425, Section 10, 30 Stat. 1151.
[2] 240 F. 274 (Ct. of App. 9th Cir. 1917), affirmed 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918).
[3] 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960), rehearing denied 363 U.S. 858, 80 S.Ct. 1605, 4 L.Ed.2d 1739.